**INTERSTATE COMMERCE COMMIS-SION, Plaintiff.**

v.

**TRAVELERS MOTOR FREIGHT, INC.,
a Corporation, Defendant.
Civ. A. No. 1014-W.**

United States District Court
N. D. West Virginia,
at Wheeling.
May 9, 1961.

**268**

"doing business as Travelers Motor Freight". The predecessor business was the owner of Certificates of Convenience and Necessity issued by the Interstate Commerce Commission, authorizing it to engage in the business of transporting, as a common carrier by motor vehicle, general commodities between points in Ohio and Ohio and Marshall Counties in West Virginia, and between points in Brooke, Hancock and Ohio Counties, West Virginia, and Newark, New Jersey, and New York within thirty miles of Newark, New Jersey, and between points, including Cleveland and Akron, Ohio, and Marshall County, West Virginia. The predecessor company had made' no attempt to exercise the franchises of these various Certificates to carry through shipments from the Cleveland, Akron areas to the Newark, New Jersey, areas and return. This predecessor company, bringing shipments into a terminal at Wheeling, West Virginia, would transship over other authorized carrier lines for the longer hauls.

Upon· acquisition, the defendant determined to "tack" the Certificates authorizing shipments from the Cleveland, Akron area to the Certificates authorizing shipments between Marshall County, West Virginia, Philadelphia, Pennsylvania, and the Newark, New Jersey, area, and solicited business, in truckload quantities, from 'the Cleveland, Akron area to Philadelphia and Newark, New Jersey, and return.

In March, 1958, representatives of the Interstate Commerce Commission explained to the defendant that this "tack-' ing" could be permitted only if the defendant would recognize and use Marshall County, West Virginia, as a "gateway", and that all through shipments, in either direction, would have to be so routed that they would pass through Marshall County, West Virginia.

Routes using Marshall County as a "gateway" are circuitous, time-consuming and expensive, both in the use of fuel and in the wear. and tear on the equipment, when compared with the more

Robert E. Maxwell, U. S. Atty., Fairmont, W. Va., Francis J. O'Reilly, Atty., Bureau of Inquiry & Compliance, I. C. C., Columbus, Ohio, and Morton B. Margulies, Atty., Bureau of Inquiry & Compliance, I: C: C., Columbus, Ohio, for plaintiff.

Wright Hugus, Jr., Phillips & Holden, Wheeling, W. Va., and George, Greek, King & McMahon (John P. McMahon) Columbus, Ohio, for defendant.

. CHARLES F. PAUL, District Judge.

In March, 1958, ,the defendant acquired the business of one, Ralph Faylor,

direct routes making use of the Ohio, Pennsylvania and New Jersey Turnpikes.

The defendant owns neither tractors nor trailers. It operates its business through contracts with owner-drivers, who own and maintain their own equipment and bear the operating costs with reference thereto. The defendant credits 75% of the proceeds of the transportation charges to the owner-driver and retains 25% for itself.

Soon after its organization the defendant applied to the Interstate Commerce Commission for Certificates which would permit direct transportation between the Cleveland, Akron areas and the eastern seaboard, but no such Certificates have yet been issued, although proceedings are still pending.

Initially, the defendant was advised by a practitioner before the Interstate Commerce Commission that it could disregard the Marshall County gateway pending the proceedings before the Interstate Commerce Commission, and the defendant did so disregard the Marshall County gateway in all of its through shipments, although it had been advised by representatives of the Interstate Commerce Commission that the gateway would have to be observed.

No serious attempts were made by the defendant to comply with the limitations of its Certificates by observing the Marshall County gateway until investigations by the Interstate Commerce Commission disclosed numerous violations in the latter part of the year 1959. These investigations led to the filing of an Information in the United States District Court for the Western District of Pennsylvania in forty counts, and, on September 29, 1960, the defendant pleaded guilty to the first thirty of said counts, and was fined $3,000.00 and costs with respect thereto. The other ten counts were dismissed. In defense of the criminal proceedings, the defendant had obtained qualified counsel, who informed the defendant that the gateway provisions would have to be observed, and the defendant circularized this information to its dispatchers and owner-drivers, and set up a "check point" at Hancher's Truck Stop on U. S. Route 40, some few miles east of the Pennsylvania-West Virginia line. It required its owner-drivers to stop at this check point and register there as evidence that they were using the circuitous route and not the more direct routes. Subsequent investigation by the Interstate Commerce Commission, covering a two-month period in October and November, 1960, disclosed irregularities in the register which indicated that some of the owner-drivers of the defendant were cheating on the check point system by having other drivers register for them while they took the shorter routes. These discovered violations led to the filing of this proceeding, seeking an injunction against further violations, on January 31, 1961.

Upon application of the plaintiff, and at a hearing thereon held February 17, 1961, a preliminary injunction was issued. At the hearing on this preliminary injunction, the defendant admitted the pleaded violations, but asserted that the situation had been remedied, and gave notice that it would move for dissolution of the preliminary injunction and resist any permanent injunction.

Hearing was had on the application for permanent injunction on March 9, 1961. At this hearing the plaintiff introduced evidence of the prior violations, which were not denied by the defendant. The defendant, however, showed that on or about the filing of these proceedings, it had changed the check point from Hancher's Truck Stop to the Windmill Service Station, which is also situated on U. S. Route 40, just west of the West Virginia-Pennsylvania state line; that it had tightened the procedures by requiring a time stamp to be affixed to the register and the initials of an employee of the Service Station, acting as an agent for the defendant, to be affixed opposite the signature of the driver on the register; that the register had been periodically checked with the logs maintained by the owner-drivers, and that, since these more strict requirements had been made ef-

fective, no violations of the gateway had occurred.

Unfortunately for the defendant's position, however, it developed at the hearing that the check point on Route 40 was no evidence that the gateway had been observed by passage through Marshall County, West Virginia. On the contrary, it was admitted by the defendant, that the maintenance of this check point was assurance only that the shipment had passed over U. S. Route 40, which, at its nearest point to the boundary of Marshall County, West Virginia, is some two or three miles north thereof. The defendant was under the impression that "substantial" compliance was all that was required by the Interstate Commerce Commission, and that such substantial compliance was sufficiently assured by the system it had put into effect. Upon inquiry, however, the representatives of the plaintiff made it clear that the plaintiff, as is its right and duty, was insisting upon literal compliance by actual travel through Marshall County, West Virginia.

Upon this development, the hearing was interrupted in order to give the defendant an opportunity to devise a system which would assure literal compliance with its Certificates, and to give evidence of the adoption and efficacy thereof.

The hearing was continued on May 9, 1961, and the defendant's evidence developed the following:

A privately-operated toll bridge spans the Ohio River from Bellaire, Ohio, to Benwood, in Marshall County, West Virginia. In its manifests for all through shipments, the defendant has routed its owner-drivers over this toll bridge; has obtained from the Bridge Company the authorized signatures of the nine toll collectors of the Bridge Company, and has entered into an arrangement whereby the toll collectors issue a written receipt for the cash toll, bearing the signature of the toll collector; and the defendant requires that its owner-drivers present such receipt, with the manifest, at the point of destination of each shipment. These receipts and manifests are checked by de-

fendant's employees at the destination terminal and are then forwarded to the Company's main office, where it is one of the duties of a clerk to double check all such receipts and manifests, and to verify the signature of the toll collector. The defendant testified that 315 shipments, using the bridge, were verified during the month of April, 1961, and that there were only a few violations of the Company's instructions, one of which resulted in the lease or contract with the recalcitrant owner-driver being cancelled. In the opinion of the defendant's principal officer, this system will make it "virtually impossible" for a shipment not to have gone into Marshall County.

The defendant reiterated its desire and intention to see to it that the gateway is observed in the future while it is operating under its present Certificates, and asks that this court exercise its discretion, as a court of equity, to deny the prayed for injunction on the showing that the complained of violations are not likely to be repeated, citing I. C. C. v. Pilot Freight Carriers, Inc., D.C.D.C. 1960, 189 F.Supp. 875, as precedent for the requested treatment by this court.

In addition to, and partly as a result of, the facts recited and found by me as hereinbefore stated, I specifically find:

(1) That the defendant knowingly and intentionally violated the provisions of its Certificates of Convenience and Necessity from the inception of its business, and was still in violation at and subsequent to the institution of these proceedings;

(2) That the first efforts of the defendant to comply with the restrictions of its Certificates followed the bringing of the criminal charges against the defendant in the District Court for the Western District of Pennsylvania, and that these efforts were ineffective;

(3) That the next effort of the defendant to bring itself in compliance was made after the investigation by the agent of the I. C. C. late in 1960, and the institution of the system roughly coincided with the institution of these proceedings.

These efforts, while in good faith, were also ineffective;

(4) That the final effort of the defendant to bring itself in compliance by the adoption of the system which it now contends makes it "virtually impossible" for violations to occur, was not instituted or adopted until after a final hearing herein was begun;

(5) That it is very difficult to get the owner-drivers to comply with the requirements of the defendant's Certificates because the economic impact of the more costly routing bears most heavily upon the owner-drivers, and constant vigilance, coupled with punitive action for violation, is required of the employer, and that future violations are likely to occur unless the last "system" adopted by the employer is maintained, rigidly supervised, and enforced.

▮ I have no doubt that, in a proper case, this court has power to deny injunctive relief, even in the face of statutory authorization for such relief (U.S.C.A. Title 49, § 322(b)), and even where past violations have been proved or admitted (See United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303).

▮ I am equally convinced that the cessation of violations, whether before or after the institution of a suit, is no bar to the issuance of an injunction. See Hecht Co. v. Bowles, 321 U.S. 321, at page 327, 64 S.Ct. 587, 88 L.Ed. 754, decided February 28, 1944.

▮ From both the Grant case and the case of Interstate Commerce Commission v. Barron Trucking Company, Inc., 3 Cir., 1960, 276 F.2d 275, it is apparent that the controlling element in the discretionary exercise of the court's equity powers is whether or not there appears a likelihood of repetition of the forbidden conduct.

▮ In the light of the circumstances of this case, particularly the defendant's original recalcitrance and the fact that each of its steps taken to secure compliance, including the last one, were under the coercion of I. C. C. investigation, criminal proceedings and, finally, the institution and prosecution of these proceedings, coupled with the fact that employee cooperation is so difficult to obtain, I am forced to the opinion that only continued pressure on the defendant will give reasonable promise of future compliance. I hold, therefore, that the Commission is entitled to the injunction prayed for.

This Memorandum Opinion will be taken as my findings of fact and conclusions of law required under F.R.Civ.P. Rule 52, 28 U.S.C.A.

An appropriate Order, limiting the injunction to the type of violation complained of and to the period until the Interstate Commerce Commission shall grant an enlargement of the Certificates under which the defendant may operate, shall be prepared by counsel for the Commission, initialed by defendant's counsel, and presented for entry.